IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UNITED STATES OF AMERICA

v.                                                          CASE NO. 4:00-cr-00052-RH-AK

RICHARD JAMES ADAMSON, JR.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Doc. 258, Second Amended Motion to Vacate under 28 U.S.C. § 2255, by Richard James Adamson, Jr. The Government has filed its response, Doc. 281, and Defendant has filed his reply. Doc. 282. This cause is therefore in a posture for decision. Having carefully considered the matter, the Court recommends that the second amended motion to vacate be denied.

## BACKGROUND

In 2001, the defendant, Richard James Adamson, Jr., was charged in a second superseding indictment with ten counts of mailing threatening communications, of threatening a federal judge, and of soliciting the murder of an FBI agent. Doc. 44. On January 3, 2002, Defendant pled guilty to Count Ten, mailing threatening communications to United States Magistrate Judge William C. Sherrill, Jr., and waived jury trial on the remaining nine counts.[1] Docs. 72-73. George W. Blow, III, Defendant's third attorney in this case, represented

_____

[1] Approximately one year earlier, on February 20, 2001, while he was represented by his first attorney, Defendant, acting *pro se*, filed a "Waiver of Jury Trial," voluntarily consenting "to be tried by a judge only." Doc. 12.

Defendant in both of these proceedings.[2]  At the plea hearing, Defendant stated that he was "in

full agreement with Mr. Blow," to whom he referred as "'father,'" regarding the waiver, Doc.

154 at 8, and Mr. Blow elaborated:

> At the time he filed his original pro se waiver, there might have been some
> questions about his competency and so forth...certainly was about his happiness
> with his counsel at that time....[3]

> However, subsequent to that time, he and I have had numerous discussions about
> this.  He still wishes to do it.  I agree with it.  I think there's a valid reason for
> doing it, and a good strategic reason for doing it.  So I'm confident that he is
> doing it for competent reasons and it's not influenced by anything that may have
> been influencing him in the past.

*Id*. at 8-9.  Later, Defendant stated:

> I would like to say that Mr. Blow has gone out of his way, above and beyond the
> call of duty to inform me of everything surrounding this case.  He's gone out and
> purchased law books for me so I can read it for myself.  He's delivered case law
> to me.  There should be an adoption petition up there somewhere from him.  But
> he really has gone out of his way, and I have no complaints whatsoever.

> *       *       *

> He's working too hard.  He actually showed up and visited me on New Year's.

*Id*. at 16.

The change of plea proceedings concluded with the following from the Court:

> In a jury trial, before a defendant is convicted, all 12 jurors have to agree that the

---

[2]Defendant's first attorney was allowed to withdraw after Defendant threatened to "knock [him] out."  Docs. 14, 16, & 17.  Defendant's second attorney was likewise allowed to withdraw after Defendant threatened him with legal action and a bar complaint.  Docs. 39, 41, & 42.  In granting the final substitution, the Court cautioned Defendant that any "abusive or hostile behavior" towards Mr. Blow would be "deemed a forfeiture of his right to counsel."  Doc. 42 at 2.  The Court also advised Defendant of his right to self-representation and his right to retain counsel of his own choosing.  *Id*. at 2-3.

[3]In fact, there was no real question about Defendant's competency.  *See* Doc. 18.

defendant is guilty.  In a judge trial there's just one person.  So if I decide you're guilty, you would be held guilty in a nonjury trial.  In a jury trial there are 12 people, and if any one doesn't agree that you're guilty, then you won't be convicted.

* * *

Also, the jury selection process takes place right here in open court in your presence.

* * *

You have a chance to talk to Mr. Blow, to consult with him, to consult with him about each decision he makes about picking a jury.

* * *

In a case like this, where the charge is sending a threatening communication to a judge, we would spend all the time that we had to to make sure that we had jurors who were willing to be completely fair, that didn't come in with any preconceived notion, that weren't going to hold you–find you guilty just because of what the charge was, but who would really listen to the evidence and hold the government to their burden of proving you guilty beyond a reasonable doubt.

* * *

And you might think that's difficult, and the nature of this charge is a difficult charge against you.  But I've had cases with charges that one would think difficult for a defendant, and we spend extra time in the jury selection process, even questioning jurors individually out of the hearing of the other jurors to make sure we get fair jurors.

* * *

Mr. Adamson, if I were charged with threatening a ballplayer, I'm not sure I'd want a ballplayer to be the one that made the decision.  If I was charged with threatening a judge, I'm not sure I would want a judge to be the one that made the decision.  But I'm not charged with any of that and you are, and it's you decision. I just want to make sure you understand that you're putting one judge in the position of making the decision instead of 12 jurors who have to connection to the legal process at all.

*Id*. at 21-23.

Defendant acknowledged his understanding of the Court's cautionary words, stating:

> [A]s Mr. Blow said earlier, there's special strategic reasons behind [the waiver of jury trial]. And the court may be aware that I do have a degree as a paralegal. I've had extensive experience with the criminal justice system, unfortunately. But it's a decision that didn't take a whole lot of discussion at all, and I would be honored to have you hear my case.

> * * *

> I think the difficulty would be more on your part than mine, because they are your constituents and co-workers and such. But I have no concern about your...ability to be impartial. I knew about you long before I came here. You have a good reputation in the state for being impartial, and I don't expect a volte-face on the philosophy of the court regarding convicts, but I don't think you'll have too much trouble with this one.

*Id*. at 22-23.

Shortly thereafter, Defendant proceeded to bench trial and was found guilty on all counts.

Doc. 78. More specifically, the Court held:

> My finding is that Mr. Adamson has been proved guilty of all nine counts, Counts 1 through 9, beyond a reasonable doubt. With respect to the first eight counts, I find that he was not acting under duress.

> First, I do not credit substantial parts of Mr. Adamson's testimony. I do not find that he was under an imminent threat of bodily harm within the Department of Corrections. I find that he had reasonable alternatives for dealing with any perceived threat, if there was any perceived threat. And I find Mr. Adamson was well familiar with the alternatives. He's filed a number of lawsuits, he'd been in touch with the Department of Justice. I reject the assertion that those actions had led to an imminent threat against him, that he could deal with only by seeking to get into federal custody.

> I don't need to reach the question, therefore, of the causal relationship between the crime and the avoidance of any harm, but I note that I have substantial questions about whether that element of a justification defense is met here.

> * * *

> In sum, though, the justification defense fails because I do not credit the assertion

that Mr. Adamson was in imminent danger of physical harm, nor the assertion that he had no reasonable alternative to the action he took.

The more difficult question in the case is Count 9.  It is with substantial reluctance in any case that a conviction gets based, in substantial part, on the testimony of a cooperating witness who obviously has an incentive to lie in an effort to get a 5K1 or a Rule 35 motion....

The factual dispute here is unusual, to say the least.  Having considered all the evidence, my finding beyond a reasonable doubt is that Mr. Adamson did solicit Mr. Householder in an effort to have Mr. Householder use any contacts he had in order to arrange to have Mr. Leon killed.

That's my resolution of the factual dispute between Mr. Adamson's testimony and Mr. Householder's testimony.  My conclusion that Mr. Adamson intended to do that is supported further by the evidence of his behavior on other occasions.

I have not overlooked the defense assertion that it would be irrational to solicit someone else to do this when Mr. Adamson didn't know Mr. Householder any better or any longer than he did, and when the information was provided that Mr. Householder was cooperating.  At least on Mr. Householder's description, the solicitation came early, at the beginning of the conversation, and thus before Mr. Adamson knew Mr. Householder was cooperating.

Also, it's clear from the facts in the case that Mr. Adamson was not concerned about authorities learning of his threats.  He mailed the threats directly to Judge Novotny.  He wrote down threats to Judge Novotny and to Mr. Leon.  It's clear that a substantial part of what Mr. Adamson was doing was intending to cause harm by communicating the threat.  In that respect, a solicitation itself, even if communicated back to Mr. Leon and to others, is just one more way to communicate the threat.

Communicating the threat in that manner would not be sufficient by itself to constitute a violation of section 373.  It is required under that statute that there be intent that another person engage in the conduct constituting the felony.

My finding is that Mr. Adamson did so intend.  I mentioned the value to him of having the threat communicated or the solicitation communicated only to show that the defense suggestion that it makes no sense because he might be found out doesn't change things in this case, because I think being found out was not something that Mr. Adamson was concerned about.

Doc. 155 at 177-80.

The Court scheduled sentencing, Doc. 79, and Defendant then moved to represent himself *pro se*.  Doc. 80.  The Court granted the motion, finding that Defendant understood the hazards of self-representation , that he had "sufficient training, knowledge and ability" to represent himself, and that he had knowingly waived his right to counsel.  Doc. 82.

Before sentencing, Defendant filed a plethora of motions, including motions for appointment of counsel for sentencing, for new trial, and to withdraw his guilty plea.  Docs. 85, 100, & 116.  As grounds for a new trial, Defendant made six claims:  (1) the Government engaged in prosecutorial misconduct; (2) the Government violated *Brady*; (3) Mr. Blow rendered ineffective assistance when he interviewed hostile witnesses alone; (4) Mr. Blow was ineffective by failing to subpoena or call any witnesses besides Defendant; (5) Mr. Blow was ineffective when he failed to move to suppress statements taken in violation of *Miranda*; and (6) the cumulative errors of the Government and Mr. Blow deprived Defendant of due process.  Doc. 85 at 1, 21, 26, 29, 34, & 40.

On April 12, 2000, the Court sentenced Defendant to 188 months imprisonment, to run consecutively to "any other sentence currently being served."  Docs. 123 & 131.  Before the imposition of sentence, the Court conducted an extensive hearing on all outstanding motions.  It began with the request for appointment of counsel, which Defendant narrowed to a request for "an attorney for sentencing purposes."  Doc. 167 at 2.  The Court denied Defendant's motion, finding that Defendant had "willfully brought about the disqualification of three successive competent, able, well-experienced [court-appointed] lawyers," and that by "bringing about that situation, Mr. Adamson has forfeited his right to appointed counsel."  *Id*. at 4-5.  The Court examined Defendant's pattern of requesting counsel and then invoking his right to self-

representation and concluded that Defendant was attempting "to create whatever issue he can for appeal and to game the system at every opportunity." *Id*. at 5.

The Court then turned to Defendant's allegations that Mr. Blow rendered ineffective assistance of counsel. At that time, Defendant thoroughly questioned Mr. Blow regarding his representation. *Id*. at 18-74.

In denying the motion for new trial, the Court found:

First, with respect to the ineffective assistance, Mr. Adamson has pointed to absolutely nothing that Mr. Blow did that would constitute ineffective assistance of counsel. Mr. Blow explained what he did on the matters about which he's been asked about here today. The explanation has all made perfect sense.

The Strickland standard, of course, would be applicable. Mr. Adamson fails at every level of the analysis. He has not shown anything that Mr. Blow did that was below the standard of an effective lawyer. He has not shown anything that could have been done that would have affected the outcome of the trial.

Mr. Adamson was convicted because he was guilty, and the government proved he was guilty. Mr. Adamson has suggested not a thing that Mr. Blow could have done to have prevented that.

Mr. Adamson alleges  prosecutorial misconduct, but has provided no claim that the government is guilty of misconduct in any respect.

Mr. Adamson has made a Brady allegation, but has not shown any favorable evidence that existed, let alone that any favorable or exculpatory evidence was withheld.

Based on the testimony regarding Mr. Adamson's statements to the officer, I believe Officer Jimenez, there was not a custodial interrogation. Volunteered remarks by a defendant give no rise to a Miranda right and would not have supported suppressing that evidence.

In short, there is no reason to believe that this was anything other than a full and fair trial in which Mr. Adamson was represented by a competent and effective counsel.

The facts are that Mr. Adamson wrote four letters to Judge Novotny that contained true threats, exactly as charged. The writing and sending of the letters

was stipulated, but it would not have made any difference, because the government could readily prove it.

The attempted defense that these were written out of necessity or under duress, the need to get out of state custody, is unfounded factually, and that was my finding after the trial, even on the assumption that that's a legal basis for the...defense.

There's a good bit of irony in Mr. Adamson's position here. The position is, essentially, that he willfully committed a federal crime–that is, threatening a federal judge–that he did it knowing and intending that it be a federal crime, and that he, therefore, get out of state custody. But now he says, because he knowingly and intentionally committed a federal crime, and he did it for the purpose of committing a federal crime, it's really not a federal crime. He's got it upside down.

It's sometimes asserted that a defendant who does not know the defendant's acts constitute a crime ought not be convicted, and under certain statutes that may be true. Mr. Adamson's claim is he knew it was a federal crime to threaten a judge. He threatened the judge so that it would be a federal crime so he would get transferred into federal custody; and then he says, because he knew it was a federal crime and did it for that reason, it's really not a federal crime. That doesn't make any sense.

In any event, my finding at the time was that Mr. Adamson didn't do this because of a need to get out of state custody. He intentionally threatened Judge Novotny and committed the other offenses with which he was charged.

*Id*. at 79-82.

The Court also denied the motion to withdraw plea, finding:

There's not a basis for withdrawing the plea. The guilty plea to the count dealing with Judge Sherrill was knowingly, voluntarily and intentionally made for reasons expressed on the record at the plea colloquy. I made it very clear to Mr. Adamson that, if he didn't like the sentence that might be entered on that count, it would not be a basis for withdrawing a plea.

In any event, it seems clear that the conviction on that count impacts the sentencing guidelines not at all. So, Mr. Adamson's assertion that he entered the plea in reliance on getting a three-level reduction for acceptance of responsibility, and since he didn't get it, he now wants to withdraw his plea, makes no sense. That is, even if he got the three-level reduction for acceptance of responsibility on that count, it would make no difference. And, in fact, the conviction on Count

Ten makes no difference on the guidelines.

*Id*. at 83-84.  The Court also orally denied Defendant counsel on appeal.

In separate notices of appeal, Defendant appealed the judgment and sentence and the denials to appoint sentencing counsel, for new trial, and to withdraw the guilty plea.  Docs. 124-127.  The Court granted Defendant leave to appeal *in forma pauperis* but denied him appointment of appellate counsel without prejudice to seeking appointment of counsel with the Eleventh Circuit.  Doc. 149.[4]  Subsequently, Defendant sought rehearing on the appointment of counsel motion and the recusal of the presiding district judge, Honorable Robert Hinkle.  Doc. 153.  The Court summarily denied rehearing, Doc. 160, and in a lengthy and detailed separate order, denied Defendant's request for recusal.  Doc. 161.

Thereafter, Defendant filed another motion for rehearing directed to Judge Hinkle's refusal to recuse himself.  Doc. 174.  The Court summarily denied the motion.  Doc. 175.[5]  Defendant did not appeal Judge Hinkle's recusal orders.

On appeal, Defendant was represented by counsel appointed by the Eleventh Circuit, Ms. Elaine Joan Mittleman.  *Adamson v. United States*, No. 02-12251 (11th Cir.) (Dec. 13, 2002, order appointing counsel).  In her appellate brief, Ms. Mittleman raised two issues: (1) whether Judge Hinkle abused his discretion in denying recusal "when the magistrates whom appellant was convicted of threatening worked in the same court," and (2) whether Judge Hinkle abused his discretion in finding that the recusal motion was not timely.  *Id*. (June 3, 2003 Appellant's E-

---

[4]The Order was subsequently amended to correct the Court's statement that Defendant was convicted of soliciting the murder of a federal judge when, in fact, he was convicted of soliciting the murder of an FBI agent.  Doc. 159.

[5]Magistrate Judge Sherrill did recuse himself after Defendant filed his first § 2255 motion.  Doc. 176.

Brief  at 6).

    In dismissing Defendant's appeals, the Eleventh Circuit based its decision on

Defendant's failure to file a notice of appeal directed to the recusal orders, finding it was without

jurisdiction to consider arguments related to the denials of the motions for rehearing regarding

the recusal orders and refusing to address the merits of those claims.  Doc. 190 at 3-4.  Because

Defendant failed to brief any issues related to his convictions, sentence, or any orders preceding

his convictions and sentence, the issues were deemed abandoned.  *Id*. at 5.

    Thereafter, Defendant filed a second motion for new trial based on newly discovered

evidence.  Doc. 193.  The Court, finding this to be yet another attempt to raise issues related to

Judge Hinkle's refusal to recuse himself, denied the motion.  Doc. 201.  Defendant appealed the

order.  Doc. 202.

    While the appeal was pending, Defendant filed a motion to vacate, set aside, or correct

sentence pursuant to 28 U.S.C. § 2255 with supporting memorandum.  Doc. 210 & 214.

Defendant simultaneously filed a motion for the recusal of Judge Hinkle from the § 2255 motion

and a motion for change of venue.  Docs. 215 & 216.  Shortly thereafter, the Eleventh Circuit

granted Defendant's motion to dismiss his appeal with prejudice, Doc. 220, and Judge Hinkle

denied Defendant's request for his recusal.  Doc. 221.  Defendant then filed an amended motion

to vacate.  Doc. 223.

    At some point, Defendant sought a writ of mandamus from the Eleventh Circuit

regarding Judge Hinkle's refusal to recuse himself.  In finding that the mandamus petition was

frivolous, the appellate court stated:

> In this case, Adamson has not demonstrated bias stemming from an extra-judicial
> source nor has he made a showing of pervasive bias that would necessitate

recusal.  The allegedly biased actions cited by Adamson related to (1) Judge
Hinkle's previous ruling on his motion for new trial, and (2) Judge Hinkle's
working relationship with the magistrate judges who were the victims in this case.
First, the mere fact that Judge Hinkle previously has ruled adversely to Adamson
does not, in itself, establish pervasive bias.  Additionally, the district judge's
working relationship with the two magistrates demonstrates neither an extra-
judicial source of bias nor judicial conduct "display[ing] a deep-seated favoritism
or antagonism that would make fair judgment impossible."

Doc. 229 at 3 (citations omitted).  Defendant's subsequent motion for reconsideration was

likewise denied, the Eleventh Circuit noting:

District judges presiding over § 2255 motions frequently are faced with
complaints about their actions in the underlying criminal [matter].  There is no
reason to doubt that the judges remain well-equipped to fairly adjudicate all such
claims.  Because this Court did not overlook or misapprehend any of the factual
or legal issues that Adamson raises, his motion for reconsideration is **DENIED**.

Doc. 232 at 2 (emphasis in original).

This cause was then stayed while Defendant pursued certiorari with the United States

Supreme Court, which was denied.  Docs. 231 & 239.  In the interim, Defendant filed a motion

to amend with a proposed second amended motion to vacate.  Doc. 233.  Defendant then sought

mandamus for this Court's failure either to review his § 2255 motion or to rule on it.  Docs. 252

& 253.  Subsequently, the Court granted the motion to amend and allowed the filing of the

second amended motion to vacate and ordered the Government to respond.  Docs. 257, 258, 261,

& 277.

On this occasion, Defendant raises five grounds for relief:

1.   Defendant was denied effective assistance of trial counsel when counsel
     failed to call a particular witness, properly to cross-examine a Government
     witness, to inform Defendant that Judge Hinkle "was friends and co-
     workers with two of the victims when counsel encouraged [him] to waive
     his right to jury trial," and to introduce into evidence copies of habeas
     petitions previously filed by Defendant;

2.      Defendant did not knowingly or intelligently waive his right to trial by jury since he did not know about the relationship between Judge Hinkle and the victims;

3.      Defendant was denied due process when Judge Hinkle failed to reveal his relationship with the magistrate judge victims before accepting the jury trial waiver and was denied his right to counsel when Judge Hinkle refused to appoint counsel to represent Defendant at the hearing on the motion for new trial, at sentencing, and on appeal;

4.      Defendant was denied effective assistance of appellate counsel when counsel failed to brief issues related to his conviction and sentence, raising instead only issues that were not "preserved by the filing of a notice of appeal"; and

5.      The Government misled the Court and concealed exculpatory evidence regarding whether the inmates solicited to kill two of the victims believed the solicitations were a scam.

Doc. 258 at 3a-3c.  Each will be considered in turn.

## DISCUSSION

I.      Ineffective assistance of trial counsel.

As noted, Defendant alleges four bases for his claim that Mr. Blow rendered ineffective assistance.  A review of *Strickland v. Washington*, 466 U.S. 668 (1984), is thus appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy.  *Strickland*, 466 U.S. at 686.  The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong.  *Id*. at 697.  The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice.  *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual

support for his contentions that counsel's performance was constitutionally deficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).  The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance.  *Strickland*, 466 U.S. at 689-90.  To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take."  *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted).  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment."  *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001).  "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).  There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions."  *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).  "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy."  *Chandler*, 218 F.3d at 1315 n.16.  "No lawyer can be expected to have considered all of the ways [to provide effective assistance]."  *Id*.  Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on.  The lawyer's strategy was course A.  And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id.*

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693.  Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome." *Id*.  Additionally, prejudice is established only with a showing that the result of the proceeding was fundamentally unfair or unreliable. *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail...are few and far between." *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).  This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether a reasonable lawyer could have acted in the circumstances as defense counsel acted. *Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

A.    Failure to call Donnie Alexander as a witness.[6]

Defendant raised this claim in his motion for new trial.  Doc. 85 at 26-27 of 64.  The Court resolved this claim adversely to Defendant at the hearing conducted on April 12, 2002, finding that Defendant had "pointed to absolutely nothing that Mr. Blow did that would constitute ineffective assistance of counsel."  Indeed, the testimony at the hearing plainly

_____

[6]According to testimony at trial, Alexander was housed at Taylor Correctional Institute with Defendant.  Doc. 155 at 42.  Alexander had originally sent Magistrate Judge Novotny a letter "relaying that Mr. Adamson had solicited him to assist in finding somebody to kill [her]." *Id*.  Later, Alexander informed the FBI that "the entire letter writing and entire thing had been a scam perpetrated by he and Mr. Adamson" because "they were tired of doing their time in the state system and wanted to do their time in the federal system." *Id*. at 43.

supports that conclusion.  Defendant questioned Mr. Blow precisely as to why he did not present

Alexander as a witness or the substance of his interviews with Alexander at trial, and Mr. Blow

explained:

> Mr. Alexander was basically ratting you out that there was a plot to do harm to
> Judge Novotny; and that at first he thought it was a scam; that you were just all
> talk.  And later he became convinced that it was real, and that he was going to
> cooperate with the FBI and was willing to wear a wire and take a polygraph, and
> all this sort of stuff.  I mean, he told them that you, I believe, had knew of a
> [cache] of weapons that had been stolen from a military base and was buried
> somewhere in North Carolina, and stuff like this.

> He was obviously trying to ingratiate himself to the government in hopes of
> getting some return.  He offered to wear a wire, and he did wear a wire.
> Apparently, at the time of the wire, he signalled you that, in fact, he was wearing
> a wire.  He was trying to play both sides of the street, and I think it backfired on
> him.

> * * *

> Mr. Adamson, I was trying very hard to convince this court that, when you wrote
> eight letters to the United States District Magistrate threatening her, you did so
> out of a sincere belief that your life was in danger; that you needed some
> attention, shall we say, to get out of the State Department of Corrections; and that
> that constituted the necessity....

> In my view, there's no point in undermining that defense by showing that you
> have propensity for doing this as a scam.  A scam is not a defense to that crime, at
> least as I understand the law....But if you write a letter to the judge that is
> perceived to be threatening, and you mail it, and it is done willfully, there's no
> specific intent required.  Therefore, the fact that you have done it as a scam
> doesn't make it right, doesn't keep it from being illegal.  And in my view, trying
> to paint a particular picture to the trier of fact...we were better off staying as far
> away from that as we could, and that's why I didn't present it and I tried not to
> get into it.

> At some point, during the judge's inquiry, while he was deliberating, when you
> wanted to say something, and I basically told you to keep quiet, that you were
> going to open up a can of worms, that's why I told you that, and I remain
> convinced of that.

Doc. 167 at 35-37.

Mr. Blow's decision to focus on a justification defense and to avoid any testimony that might undermine the presentation of that defense is plainly the type of strategic choice protected from challenge as it was a reasonable strategy to use, and Defendant cannot show that no "no competent counsel would have taken similar action.  Counsel therefore did not act deficiently, and further inquiry is not necessary.

B.      Failure properly to cross-examine Special Agent Mark Leon.

In Count Nine, Defendant was charged with soliciting Arthur Householder, a fellow inmate, to use his contacts on the outside to arrange the murder of Special Agent Leon.  Doc. 44. In this claim, Defendant maintains that Mr. Blow should have questioned Leon regarding Alexander's admission that his letter to Magistrate Judge Novotny was part of a scam that he and Defendant concocted in order to be removed from state custody, *see supra* at n.6, as it "would have bolstered Defendant's defense that his alleged solicitation of Householder was a scam." Doc. 258, Mem. at 4.

Unlike what might occur in a jury trial where it is sometimes necessary for an attorney to cross-examine a witness on an alleged favorable point to make sure the jury "gets it," in a bench trial, the Court, sitting as the finder of fact, does not need matters repeated to it ad infinitum. Special Agent Leon stated on direct examination that Alexander had told him the letter he wrote Magistrate Judge Novotny was part of a scam with Defendant to secure federal detention, and the Court can discern nothing that counsel could have asked him further on cross-examination to bring that point home any clearer.  Be that as it may, as Mr. Blow stated, he did not want the Court to focus on Alexander's statement, as it undermined his defense that everything Defendant did was because he was in imminent fear for his life at the hands of state actors.  This was clearly

a matter of reasoned decision-making on counsel's part and did not rise to the level of deficient performance.

> C.      Failure to inform Defendant of Judge Hinkle's relationship to the magistrate judge victims.

In this claim, Defendant maintains that he would not have agreed to a bench trial before Judge Hinkle if counsel had informed him that Magistrate Judges Sherrill and Novotny "routinely worked on cases assigned to Judge Hinkle...."  Doc. 258, Mem. at 5.  Defendant acknowledges that he knew these magistrate judges were employed in the Northern District of Florida and "were thus co-workers with Judge Hinkle," but he did not know that they "personally worked" on Judge Hinkle's cases.

Long before Mr. Blow was appointed to represent Defendant and the issue of  jury waiver was explored in open court, Defendant had filed a *pro se* waiver of jury trial.  Doc. 12. He was competent to make that filing, *see* Doc. 18, and indeed, at the hearing into the matter, it was clear that Defendant had made that decision himself after extensive consultation with Mr. Blow.  At that time, Defendant touted his "extensive experience with the criminal justice system" and agreed with counsel's explanation that the decision to waive jury trial was a strategic one.  The Court took that opportunity fully to explain to Defendant the ramifications of his decision and the rights attendant to having a jury sit as the trier of fact, even going so far as to advise Defendant that he should really consider his decision in light of the fact that he was agreeing to allow a federal judge to decide whether he had committed various offenses against other federal judges, judges which Defendant knew worked in the Northern District of Florida. Defendant was adamant that he wanted Judge Hinkle to make the decision regarding his guilt or innocence.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.  The Court has no hesitation in finding that counsel's alleged failure specifically to advise Defendant that the magistrate judge victims routinely worked on cases with the presiding district judge (a failure which the Court assumes *arguendo*) did not undermine the proper functioning of the adversarial process or affect this Court's confidence in the outcome of the proceeding.  Even if Defendant had proceeded to trial before a jury of his peers, he would have been convicted, as the evidence against him was overwhelming.

> D.     Failure to introduce into evidence copies of habeas petitions previously filed by Defendant.

This issue was likewise covered in the hearing on Defendant's motion for new trial and was decided adversely to him.  *See* Doc. 167 at 79.  Defendant thoroughly questioned Mr. Blow regarding his failure to introduce copies of documents Defendant had previously filed which referenced his physical abuse at the hands of penitentiary employees.  The following exchange between Defendant and Mr. Blow occurred and explains counsel's decision to forgo their introduction:

> Q.     Do you believe that in fairness that the court should have considered that evidence, those over 200 grievances and allegations of beatings and abuse that the DOC officials have responded to [which were part of the official file in *Adamson v. Moore*, Cause No. 4:00cv309-WS (N.D. Fla.)], and that the defense regarding Judge Novotny's letters were of necessity?
>
> A.     No, sir.  Now, let me explain why I don't think so.
>
> First of all, the fact that you write a grievance and say, "I've been assaulted," or whatever, does not necessarily make it admissible evidence....You can testify that, but for the fact that you have written it

sometime in the past doesn't necessarily make it true.  I don't recall any time that they responded to it and found that, in fact, you had been physically abused and...something resulted.  I think if there had been some action that they had taken and found that your complaints were substantiated, that might be a different story.  The simple fact that you write a grievance and say, "I've been abused," doesn't prove that.

* * *

[U]nfortunately, if you look at some of those [grievances] and their responses[,] [s]ome of those responses were not very favorable to you, including some explanations about your close management status, and they considered you to be a violent inmate.

Now, I'm not sure I would agree with them at all on that, but they weren't asking me.  I don't think that helps your case, Mr. Adamson.

I mean, we were trying–I was trying real hard, and I certainly believed

you

to be in agreement with my defense, to correct the impression that this court had perhaps already formed–all right?–because of the instances with Mr. Clark and Mr. Harper, and what the judge said in the order that appointed me, where he said he though that you were gaming the system.  I was trying very hard to change that impression and to present to the court an image of an individual who is confined, who is being mistreated, who wants nothing more than to be treated as a human being; and that your actions in writing these letters to Judge Novotny as a matter of self-defense, if you will, was reasonable.

For this reason, going into things that may have painted a picture of you as having violent propensities, or having management problems within the prison, or having engaged in a series of scams before involving threatening judges, and so forth, was not helpful in my view to the defense that we were trying to present and the image of you that I was trying to present.

Doc. 167 at 54-56.  Counsel's explanation reflects a studied strategy which Defendant cannot

show was beyond what any competent counsel would have followed.

II.     Waiver of jury trial.[7]

_____

[7]Under Fed. R. Crim. P. 23(a), three things must occur for a defendant to waive his right to jury trial:  the defendant must make the waiver in writing, the Government must consent to the

In this claim, Defendant maintains that he did not knowingly or intelligently waive his right to trial by jury since he did not know about the relationship between Judge Hinkle and the magistrate judge victims.  The record plainly belies this assertion.

A defendant is

sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and that a judge alone will decide guilt or innocence should he waive his jury trial right.

*United States v. Martin*, 704 F.2d 267, 273 (6th Cir. 1983).  The Court covered these matters and stressed to Defendant that he consider the import of having a judge sit solely in judgment of a defendant accused of acts against other judges.  At that time, Defendant candidly advised the Court that he knew about Judge Hinkle's working relationship with the  magistrate judge victims--"I think the difficulty would be more on your part than mine, because they are your constituents and co-workers and such"--and that he was not concerned that the judge's impartiality would be affected by that relationship.

"Solemn declarations in open court carry a strong presumption of verity."  *Blackledge v. Allison*,  431 U.S. 63, 73-74 (1977).  Defendant, a trained and litigious paralegal, knew that the judges were "co-workers," and the fact that Magistrate Judges Sherrill and Novotny "routinely work[ed] on cases assigned to [Judge Hinkle]" does not elevate the relationship of the three judges to something more than "co-workers."  Thus, Defendant had sufficient knowledge of the judges' relationships to make a knowing and intelligent waiver of his right to jury trial, and his continued suggestion that Judge Hinkle was "operating under an apparent conflict of interest," a suggestion which has been repeatedly rejected by Judge Hinkle and the Eleventh Circuit, does

waiver, and the Court must approve it.  Indisputably, the rule was followed in this case.

not alter that conclusion.

The Court closes this section with the following words from the United States Supreme

Court .  Although uttered in a different context than presently at hand, they are instructive:

> [A] determination of guilt by a court after waiver of jury trial [can] not be set
> aside and a new trial ordered except upon a plain showing that such waiver was
> not freely and intelligently made.  If the result of the adjudicatory process is not to
> be set at naught, it is not asking too much that the burden of showing essential
> unfairness be sustained by him who claims such injustice and seeks to have the
> result set aside, and that it be sustained not as a matter of speculation but as a
> demonstrable reality.  Simply because a result that was insistently invited,
> namely, a verdict by a court without a jury, disappointed the hopes of the accused,
> ought not to be sufficient for rejecting it.

*Adams v. United States ex rel. McCann*, 317 U.S. 269, 281 (1942).

III.    Denial of due process.[8]

In this claim, Defendant claims that Judge Hinkle was statutorily required to recuse

himself, and his failure to do so resulted in a denial of Defendant's right to due process, thereby

entitling him to a new trial.  This claim has been considered by this Court and the court of

appeals in one form or another on several different occasions and found to be without merit.  The

Court does not believe further discussion is warranted.

---

[8]In Ground III of the motion itself, Defendant includes an allegation that the Court
violated his Sixth Amendment right to counsel when it refused to appoint him an attorney to
represent him at sentencing.  He did not, however, argue the issue in his attached Memorandum.
To the extent that Defendant nonetheless intended this to be a viable issue, it is without merit.
*See United States v. McLeod*, 53 F.3d 322, 324-26 (11th Cir. 1995).

IV.     Ineffective assistance of appellate counsel.

In this claim for relief, Defendant complains that the attorney appointed by the Eleventh Circuit to represent him on appeal was ineffective when she failed (1) to challenge the denial of Defendant's motions for new trial and for appointment of counsel at sentencing and (2) to challenge the sufficiency of the evidence at trial, the overruling of Defendant's objections to the PSR, and the sentence imposed.

Assuming arguendo that counsel acted deficiently in her prosecution of the appeal, Defendant was not prejudiced thereby, as there is not a reasonable probability that the outcome of the appeal  would have been different.  In other words, there is not a reasonable probability that Defendant would have been successful on appeal if counsel had pursued the matters just noted.  The evidence at trial overwhelmingly supported Defendant's convictions on all counts, and Defendant's sentence was within the Sentencing Guidelines.  Furthermore, the objections were properly disposed of, and thus, an appeal of Defendant's conviction and sentence would not have been successful.  *See United States v. Adams*, 174 F.3d 571, 578 (5th Cir. 1999) (to reverse conviction after bench trial, appellate court must conclude that, viewing evidence in light most favorable to Government, no rational trier of fact could find substantial evidence indicating defendant's guilt beyond reasonable doubt).

As to the post-trial motions, they likewise had no reasonable chance of success on appeal. The Court conducted a hearing on the motions, painstakingly examining the bases for Defendant's request for a new trial and his request for appointment of counsel.  The Court fully supported its decision on both motions, and as more fully explained *supra*, the Court's rulings were proper and not reasonably open to reversal.

V.      Deliberate misconduct by Government.

Finally, Defendant argues that the prosecutor, Karen Rhew, purposely withheld *Brady*

material from the defense after Defendant wrote Ms. Rhew a "series of cards and letters" in

which he "commented on Ms. Rhew's lack of breasts and insinuated she was a lesbian."[9]  Doc.

258, Mem. at 17.  More specifically, Defendant claims that he attempted another solicitation

"scam," which ultimately involved two other inmates, Kenneth West and Christopher Michelson.

According to Defendant, Ms. Rhew withheld evidence that Michelson threatened to kill West

after West informed him that Defendant's solicitation of the murders of Judge Novotny and

Agent Leon was a scam.  In Defendant's view, this would have bolstered his argument that the

solicitation of Householder was also a scam.

To establish a *Brady* violation, Defendant must first show that the Government possessed

evidence favorable to Defendant.  Even if the Court assumes this information was favorable to

Defendant, he cannot establish that the Government "possessed" this information in the first

place.  Defendant candidly acknowledges that his entire argument is premised on "information

and belief" that the Government knew, either through West or a prison official, the basis for

Michelson's threat against West.  Otherwise, why would Ms. Rhew not have called either inmate

as a witness at trial?  Defendant's belief , however, that the Government knew West and

Michelson would claim that the solicitation was a scam, no matter how sincere it may be, is

insufficient as a matter of law to establish the Government's knowledge of allegedly favorable

evidence.

Furthermore, there is not a reasonable probability that even if the Government had

---

[9]According to Defendant, he acquired Ms. Rhew's "concealed home address" through
trickery upon the Florida Department of Motor Vehicles.  Doc. 258, Mem. at 17.

disclosed this evidence (which, of course, requires the Court further to assume that the Government knew about this evidence), the outcome of the proceedings would have been different, the fourth *Brady* element.  It cannot be disputed that Mr. Blow interviewed both West and Michelson and had access to their FBI interviews, Doc. 167 at 25 & 61-63, and thus, he potentially had access to the evidence that Defendant now charges the Government withheld. Assuming Mr. Blow had known of West's statement that Defendant's solicitation was a scam, it is still highly unlikely that counsel would have chosen to use the information.  As Mr. Blow explained with regard to his decision not to call Donnie Alexander as a witness, he wanted the Court to focus its attention on Defendant's contention that everything he did was because he sincerely believed he was in imminent danger.  Bringing forth evidence that Defendant had solicited even more persons to carry out his plans for the murders of Judge Novotny and Agent Leon would have clearly undermined that defense.

## CONCLUSION

Having carefully considered the matter, the Court finds that Defendant has failed to show that either trial or appellate counsel rendered ineffective assistance in representing him.  The Court further finds that Defendant has failed to establish any constitutional violation regarding his waiver of jury trial, Judge Hinkle's refusal to recuse himself, or the withholding of *Brady* material.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's second amended motion to vacate, Doc. 258, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this _**11**th_ day of June, 2007.




_s/ A. KORNBLUM_
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**




<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**